776 So.2d 1249 (2000)
STATE of Louisiana
v.
Irvin J. CLARK.
No. 2000-KA-0348.
Court of Appeal of Louisiana, Fourth Circuit.
December 13, 2000.
*1250 Harry F. Connick, District Attorney, Nicole Brasseaux Barron, Assistant District Attorney, New Orleans, LA, Counsel for Plaintiff/Appellee.
C. Gary Wainwright, and Yvonne Chalker, Louisiana Appellate Project, New Orleans, LA, Counsel for Defendant/Appellant.
(Court composed of Judge MIRIAM G. WALTZER, Judge JAMES F. McKAY and Judge MICHAEL E. KIRBY).
WALTZER, J.

STATEMENT OF THE CASE
Defendant Irvin Clark was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1. Defendant pleaded not guilty at his arraignment. The trial court denied the motion to suppress the evidence. This Court granted defendant's writ application, but denied him relief, as to his motion to quash a stipulation that his nickname was "TeTe."[1] On 10 December 1997, a twelve person jury found defendant guilty as charged. The trial court denied defendant's motion for new trial on 9 January 1998 and, after defendant waived all legal delays, sentenced him to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. The trial court granted defendant's motion for appeal.
The record was lodged with this court on 11 February 2000, without transcripts, and was supplemented on 2 March 2000 with a transcript of the second day of trial, and on June 22, 2000 with transcripts of two motion hearings.

FACTS
Tameika Henry, fourteen years old at the time of trial, testified that she knew defendant by his nickname of TeTe, and confirmed that she had known him for a couple years.[2] She also had known Todd Barnes for a couple of years. She recalled the night Todd Barnes was shot and killed, near the "Black Magic" club. She said she was present on the night of the shooting, but did not see it. She admitted having previously given police a taped statement that she had seen the shooting, and further admitted that she had identified defendant in a photographic lineup as the shooter. However, she claimed she identified defendant as the shooter simply because people had said he had done it. The victim's family asked her to identify defendant and testify against him. Ms. Henry said that she lied when she told New Orleans Police Detective Dwight Deal that defendant shot the victim. She claimed that she was given money to do it, but could not remember how much money it had been, only that it was "a lot of money," "way more" than fifty dollars. However, she subsequently said it was about twenty to twenty-five dollars. Ms. Henry said she was not scared to testify, but admitted that defendant's family had visited her. Ms. Henry testified on cross examination that she was twelve years old and a runaway from home at the time of the shooting. She was walking near the "Black Magic" club, heard shots, and ran away. She was there when police arrived, but did not say anything to them. People began saying that she had seen the shooting and, approximately two weeks later, the victim's relatives approached her and offered her *1251 money. She claimed she agreed because she needed the money. The victim's relatives gave her twenty-five dollars after she agreed to say what happened, and she apparently thought she would get more later. She recalled that two of the relatives were present when she gave her statement to police. The information she gave police was simply things she heard other people say.
Dr. William Newman, qualified by stipulation as an expert in the field of forensic pathology, performed the autopsy on Todd Barnes. He said the victim sustained gunshot wounds from five bullets, including a fatal one to the head. All of the bullets had been fired from at least two feet away. No drugs were detected in the bodily fluid samples taken from the victim.
New Orleans Police Officer Timothy Seuzeneau was qualified as an expert in the field of latent fingerprint identification and forensic lighting. Officer Seuzeneau testified that it is extremely difficult to obtain identifiable fingerprints from firearms cartridge casings, and that he was unable to obtain any such prints from the one live 9mm cartridge and four spent 9mm cartridge casings introduced in evidence by the State.
Donald Jenkins, who admitted a prior crack cocaine conviction, and who was on probation at the time of trial, testified that he had been a good friend of the victim. He said he had been in the victim's car a day or two before the shooting, and that it would not be unusual for his fingerprints to have been on the victim's car. Mr. Jenkins also said he had grown up with defendant. He never knew defendant had a nickname of TeTe.
It was stipulated that defendant's nick name was TeTe. It was further stipulated that a latent fingerprint lifted from the exterior passenger door of a 1984 Cadillac, two-door, blue over white, Louisiana license plate number CYT 545, was matched to Donald Jenkins, while three other prints lifted from the car were deemed not suitable for identification.
Trudy Barnes, the victim's sister, testified that she was present when her brother had an argument with defendant, who she knew as TeTe, on 9 October 1994, some two weeks before the murder. Defendant claimed he had left a gun in the victim's car and wanted it back, while the victim said he did not have the gun. At one point the victim slapped defendant. She said she telephoned police because she was afraid something would happen, but that everyone had gone by the time police arrived. Ms. Barnes said at that time she was living at 2630 Eagle Street. After the murder, Ms. Barnes' cousin, Dante Robinson, informed her that someone named TeTe had killed the victim. Approximately one week after the murder, someone named Sheila told her mother that Tameika Henry had been present at the time of the shooting, but was afraid come forth. Ms. Barnes' friend, Jesse, and Sheila talked to Ms. Henry and took her to the home of the victim's mother. Ms. Henry told them everything that happened, and she was driven to talk to Det. Deal. Ms. Barnes said they were concerned about Ms. Henry's safety. Ms. Barnes denied promising Ms. Henry anything or forcing or coercing her to make an identification. Ms. Barnes identified defendant's photograph for police. Ms. Barnes stated on cross examination that her brother informed her that he had removed TeTe's gun from his car, but never told her what he did with it. She said she was at the scene of the shooting, and kept asking Dante Robinson and someone named Cornelius what happened, but that neither responded.
New Orleans Police Homicide Detective Dwight Deal testified he investigated the murder of Todd Barnes, who was shot to death in the 8600 block of Apple Street on 23 October 1994. Evidence at the scene was photographed and collected at his direction. Four spent 9mm cartridge casings were collected at the scene, along with one live 9mm cartridge. Det. Deal *1252 speculated that the shooter might have ejected the 9mm live cartridge when the gun jammed. Det. Deal spoke to Dante Robinson, from whom he learned that the gunman's nickname was TeTe. Dante Robinson informed him he had been a passenger in the victim's Cadillac when the victim parked on Apple Street. Dante Robinson noticed a that a pearl white Pontiac Grand Am with dark-tinted windows was parked behind them. As Dante Robinson sat in the victim's car, a person exited the Grand Am and walked past the driver's side of the Cadillac. Dante Robinson could only see the person's clothes, not his head, but the victim told him that it was TeTe, with whom the victim said he had fought the day before. Dante left the car to talk with Cornelius Turner on a nearby porch. Dante Robinson said TeTe turned around, walked back to the passenger side of the vehicle and opened fire on the victim, who was still in his Cadillac. The victim attempted to escape through the driver's door, but TeTe ran around and continued to fire at him. Dante Robinson said at one point TeTe's gun jammed. After the shooting, TeTe ran back to the parked Grand Am, entered the passenger door, and drove off toward Leonidas Street. Det. Deal testified that Dante Robinson's statements were consistent with the physical evidence. Det. Deal ran a computer check on a license plate number of a white Pontiac, given to him by Trudy Barnes, who took it from a vehicle parked in front of defendant's residence on Nelson Street, and discovered it was registered to Alvin Clark. Det. Deal said he spoke with the victim's sister, Trudy Barnes, and learned of the prior altercation involving defendant and the victim. He identified a police operator complaint history from 9 October 1994, reflecting a call about a fight at 2626 Eagle Street. The call was marked unfounded, suggesting that the fight had ceased and the participants had left the area.
Det. Deal later met with Trudy Barnes and Tameika Henry, the latter, an eyewitness to the murder, from whom he took a taped statement. He presented Ms. Henry with a photographic lineup, and she identified defendant's photograph. Det. Deal said he also presented Trudy Barnes a photographic lineup, and she selected defendant as the person she knew as TeTe, the person with whom the victim had fought two weeks before the murder. Det. Deal identified the audio tape of Ms. Henry's statement, and the transcribed copy of the tape. He said she was alone with him during questioning. To his knowledge, no one from the victim's family gave Ms. Henry any money or any reason to come forward other than to tell the truth. Det. Deal identified a supplemental police report, which listed defendant's address as 8203 Nelson Street.
New Orleans Police Detective Kevin Balancier testified that he had been at the scene of the homicide, and later participated with Det. Deal in the 10 July 1995 arrest of defendant at a Tulane Avenue motel. Det. Balancier knew defendant by his street name of TeTe, and by his actual name of Irvin Clark. He had known defendant for approximately seven years, and had received information that he was hiding out of town. Det. Balancier said defendant had a Tech 9 firearm in his possession when arrested at the motel. He saw defendant holding the gun while standing at the door of the motel room, as another individual was leaving the room. Another officer yelled "gun." When Det. Balancier entered the motel room, he observed the gun on the floor, and defendant being handcuffed by another officer in the bathroom. Det. Balancier unloaded the gun, and eventually submitted it as evidence to the property room. He identified the gun at trial.
New Orleans Police Sergeant Brian Weiss testified that he participated in defendant's arrest in 1995. Sgt. Weiss said he and other officers were preparing to arrest defendant in his motel room, when the door to the room opened and another individual stepped out. Sgt. Weiss said *1253 that when he grabbed that individual he noticed defendant looking around the door, pointing a 9mm black assault-type firearm, and he yelled "gun." Sgt. Weiss said no one else was in the room. He identified the gun at trial.
New Orleans Police Crime Lab Officer Gerald Winbush was qualified by stipulation as an expert in the field of ballistics and firearm identification. Officer Winbush test-fired one of the cartridges recovered with the seized firearm, and said the spent casing from that test-firing matched the spent casings found at the scene of the murder; they were all fired by the firearm seized from defendant at the time of his arrest.
Carl Stewart testified that he was currently incarcerated, with charges against him pending in Federal court. He admitted prior convictions for possession with intent to distribute narcotics, and a firearm charge. Mr. Stewart said he had known defendant for approximately five years, but had never talked to him. He had known the victim for approximately seven years. He said he was a friend of Kendall Marcel, someone he had known for ten years. He first learned of Todd Barnes' murder the day after it happened, somewhere around 10:00 or 11:00 a.m., while he and Kendall Marcel were riding around together. He said he and Mr. Marcel had been together since the morning before.
Bernice Clark, defendant's great-grandmother, testified that defendant resided with her when he was younger. She gave him the nickname TeTe when he was between the ages of eight and twelve, because he used to cry so much. When asked whether, when defendant lived with her, she ever had a weapon in the house, she replied "no," and said she did not allow weapons in her home.
Terrance Michael Clark, defendant's cousin, a security guard, testified that one night in October he, defendant and someone named Terrell drove to Club Rumors in defendant's 1980 "something" silver Chevy Caprice. They arrived at Club Rumors shortly after 11:00 p.m., and did not leave until after 3:00 a.m. He subsequently heard that Todd Barnes had been murdered, and that police were looking for defendant in connection with the murder. He said defendant never disappeared for eight months. It was brought out during cross examination that the night he and defendant went to Club Rumors was the same night Todd Barnes was murdered. Terrance Clark admitted that he had a relative named Alvin Clark who once had owned a white vehicle.
Terrell Brown testified that he had known defendant for most of his life. Mr. Brown said he was "rapper," and was supposed to perform at Club Rumors on the night of October 24.[3] Defendant picked up him up between 9:30 and 10:00 p.m., and then they picked Terrance Clark. They arrived at Club Rumors, and he learned at approximately 11:15 p.m. that he would not be performing. They left the club between 3:00 and 3:30 a.m. Mr. Brown stated that defendant was at the club the whole time.
Kelly Lewis testified that she knew defendant and had known the victim, both from the neighborhood, and that she had gone to school with defendant. She was at Club Rumors on 24 October and saw defendant there at about 11:00 p.m., or heard someone call his name. She said she knew someone else in her neighborhood named TeTe.
Keith White testified that he had gone to school with both defendant and Todd Barnes, and said Todd Barnes was a friend of the family. Keith White witnessed Todd Barnes' shooting, and said defendant did not do it. He was sitting on his aunt's front porch with his cousin, someone named Cornelius, and two other friends. The victim drove up, parked his car, and *1254 went with another person into the Black Magic Lounge. When they returned from the bar they sat on the porch with Mr. White, Cornelius and the other two individuals, before returning to the victim's car. The victim's companion exited the car and came back to the porch to speak with Cornelius. An unknown individual walked past the porch, then turned and started shooting at the victim, who was seated in the driver's seat of his car. The shooter's gun jammed at some point, but he cleared it and shot again. Mr. White said the shooter did not get into a car and drive away, but ran down the street. Mr. White said defendant was not present that night.
Defendant testified that he had never been convicted of a crime, and lived with his grandmother on Nelson Street. He claimed he was the victim's friend. On the night of the shooting, he went to Club Rumors with Terrell and Terrance, and had not been near Club Black Magic at all that night. He did not learn defendant had been shot until the next day. He heard police wanted to question him, and said he did not leave the area. Defendant admitted on cross examination that he and the victim "had a few words" over a gun. However, he denied that defendant had slapped him, and said defendant had never made him angry. He denied being in possession of the murder weapon, saying that someone else had been in the motel room with him. However, he admitted he had been convicted of aggravated assault of the police officers who came to arrest him at the motel. Defendant admitted that his uncle, Alvin Clark, once owned a white vehicle, but said that a couple of his friends and family members had owned white vehicles.

ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant claims that the record is so incomplete that his conviction should be reversed. The trial court has certified that the transcript of the first day of the two-day trial is missing from the record and is unavailable.
La. Const. Art. I, § 19 provides in pertinent part that no person shall be subjected to imprisonment without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La.C.Cr.P. art. 843 requires, in all felony cases, the recording by the clerk of court stenographer of all the proceedings As a corollary, La. R.S. 13:961(C) provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required. A criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel was not also trial counsel. State v. Landry, 97-0499, p. 3 (La.6/29/99), 751 So.2d 214, 215. "[W]here a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully recorded trial." Id.
We recognize that there may be some circumstances where a complete appellate review of a conviction and sentence can be accomplished, even when there are missing portions of the trial record. See, e.g., State v. Cooley, 98-0576, p. 9 (La.App. 4 Cir. 11/17/99), 747 So.2d 1182, 1187.
We note that the record does not suggest in any way that the unavailability of the transcript of the first day of trial is due to the fault of defendant or his counsel. Defendant was sentenced on 9 January 1998, and granted an appeal that same date. The return date was set for 10 March 1998. The trial court did not appoint appellate counsel until nearly seven months later in October, 1998, after being twice ordered to do so by this Court. The *1255 record was not lodged with this court until February of 2000, and the transcript of the second day of trial was not lodged with this court until 2 March 2000.
The minute entry from 9 December 1997, the first day of trial, reflects that on that date the jury was selected, two witnesses testified for the State, and three photographs were introduced into evidence by the State. The two witnesses who testified were Dante Robinson and Kendall Marcel. Dante Robinson featured prominently in the State's case, as, according to Det. Deal, he was at the scene of the murder, and exited the victim's car some moments before the shooting, which he witnessed. Det. Deal said Dante Robinson told him that the victim said the person who, minutes later, would kill him, was named TeTe, and that he had a fight with TeTe. In her closing argument, defense counsel attacked Dante Robinson's credibility, stating that he testified to "so many things" that he did not tell Det. Deal. The only other State witness who was present at the scene was Tameika Henry, and she claimed not to have seen the shooting. According to defense counsel's closing argument, Kendall Marcel testified that he had seen defendant before the murder with a firearm that looked like the murder weapon.
In State v. Ruffin, 97-0612 (La.App. 4 Cir. 5/19/99), 738 So.2d 624, this court reversed the convictions and sentences of a defendant convicted of two counts of armed robbery, where a portion of the testimony of one police officer, and perhaps a portion of another witness's testimony, were missing from the record. This court held that to assume the missing transcript portion was unimportant would be pure speculation.
In the instant case, it is an inescapable conclusion that the missing testimony of Dante Robinson is important, and that without it, there can be no meaningful review of the record for, at the very least, the constitutional sufficiency of the evidence to sustain defendant's conviction.

CONCLUSION AND DECREE
For the foregoing reasons, defendant's conviction and sentence must be vacated, and the case remanded for a new trial. Defendant's remaining assignments of error, although presenting very serious issues of effectiveness of counsel, will not be addressed because our disposition of his first assignment of error has rendered them moot.
CONVICTION AND SENTENCE VACATED. CASE REMANDED FOR NEW TRIAL.
NOTES
[1] State v. Clark, unpub., 97-2026 (La.App. 4 Cir. 11/5/97), 701 So.2d 272.
[2] The nickname will be referred to uniformly as "TeTe."
[3] Defense counsel used the date of October 24 when questioning both Terrell Brown and the witness who followed him, Kelly Lewis. The date of the murder was October 23.